In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00118-CR
______________________________


WILLIAM RAY JACOBS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 14,725-96


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          William Ray Jacobs appeals from the denial of his post-conviction motion for DNA
testing in connection with his 1997 conviction for aggravated sexual assault. This is
Jacobs' second effort to obtain such testing. His first motion for testing was denied by the
trial court in 2002, and its denial was affirmed by this Court in Jacobs v. State, 115 S.W.3d
108 (Tex. App.—Texarkana 2003, pet. ref'd). Jacobs was convicted for forcing a woman,
at gunpoint, to perform oral sex on him.


 
          In disposing of his first motion, the trial court acknowledged there was biological
material available for testing, including "scrapings," from the victim's face, saliva samples,
and "scrapings" from fingernails and clothing. Id. at 110. Two human hairs were found
when submitted to a crime laboratory for testing, but they had no root material or skin cells
as are necessary to perform nuclear DNA testing, and mitochondrial DNA testing that
would be effective was not then available at that laboratory. The State filed a motion to
reconsider, which, after hearing, was granted by the trial court. Based on a large amount
of inculpatory evidence, including eyewitness testimony and testimony from the
defendant's wife, the trial court found that DNA testing would not serve to exculpate Jacobs
and denied that motion. We affirmed.
          In this, his second motion for DNA testing, Jacobs duplicated the same requests
made previously. Article 64.01(b)(1)(A)(ii), (b)(2) allows a second attempt to obtain DNA
analysis in light of improved technical abilities. Tex. Code Crim. Proc. Ann. art.
64.01(b)(1)(A)(ii), (b)(2) (Vernon Supp. 2005).
          The authority of a court to hear a particular case is a systemic requirement that
cannot be waived or conferred by consent and which may be considered at any time. 
Mendez v. State, 138 S.W.3d 334, 340 (Tex. Crim. App. 2004) (citing Marin v. State, 851
S.W.2d 275, 279–80 (Tex. Crim. App. 1993)); see also Tex. Ass'n of Bus. v. Tex. Air
Control Bd., 852 S.W.2d 440, 445–46 (Tex. 1993) (holding it is appropriate for reviewing
court to raise sua sponte issue of lower court's subject matter jurisdiction and address it
for the first time on appeal).
          This is evidently a question of first impression. We first address Jacobs' initial
argument: that the trial court which ruled on his motion had no authority to do so. Article
64.01(a) requires the submission of DNA testing to be to made "to the convicting court." 
Tex. Code Crim. Proc. Ann. art. 64.01(a) (Vernon Supp. 2005). The convicting court was
the 114th Judicial District Court, which in 1997 had jurisdiction over Wood and Smith
Counties. Jacobs was tried and convicted in Wood County. However, in 1999, the 114th
court was divested of jurisdiction over Wood County, and its authority over that county was
vested in the newly created 402nd Judicial District Court.
          Jacobs' motion was thus decided by the 402nd Judicial District Court, which is the
successor court over the county in which he was convicted. Jacobs argues that, because
the DNA statute requires the determination to be made by the "convicting court," the 402nd
court has no authority over his motion. We disagree. The legislation creating that court
required all cases then pending in the 114th Judicial District Court to be transferred to the
402nd Judicial District Court. Act of May 30, 1999, 76th Leg., R.S., ch. 1337, §§ 10, 23,
1999 Tex. Gen. Laws 4547, 4549, 4551 (effective September 1, 1999). It did not explicitly
address the status of cases that had previously been decided by that court. We also
recognize that criminal cases are required to be tried in the county in which some portion
of the offense occurs, as shown by the list of venue requirements found in Article 13 of the
Texas Code of Criminal Procedure. The DNA statute also contains provisions requiring
responses from the state—which in this context is the district attorney's office for the
county of conviction—and if hearings are necessary, there is authority that they must be
held in the county of conviction. If the court is required to appoint counsel, the procedures
set out by the Code authorize only district courts trying cases in the county to appoint
counsel, Tex. Code Crim. Proc. Ann. art. 26.04(b)(1) (Vernon Supp. 2005), and they are
to be paid according to a fee schedule adopted (among others) by district judges trying
criminal cases in that county. Tex. Code Crim. Proc. Ann. art. 26.05(b) (Vernon Supp.
2005). If a reporter's record is to be prepared for appellate review, the reporter must be
paid from the general funds of the county in which the offense was committed. Tex. R.
App. P. 20.2.
          Although the statute creating the 402nd Judicial District Court does not explicitly
state it has jurisdiction over DNA appeals,


 it is apparent from the scope of the enacting
statute and the other requirements common to all criminal cases—as well as the removal
of Wood County from the jurisdiction of the 114th Judicial District Court—that the
Legislature intended for the 402nd court to act as the successor court to the 114th court
for these purposes. Thus, we conclude that the motion was properly presented to the
402nd Judicial District Court of Wood County. The contention of error is overruled.
          Jacobs contends on the merits that the court erred by denying his motion for DNA
testing this time because he established that a reasonable probability existed that the
testing would prove his innocence. In his argument, he takes the position that the DNA
evidence could establish the involvement of a third person, thus it could prove his
innocence. This is the same argument posited in his initial DNA motion, covering the same
evidence, that we addressed in our prior opinion. 
          For the same reasons as stated in that opinion, we likewise conclude here that there
is nothing to suggest that, even if DNA testing showed that a third party was present, it
would necessarily exonerate Jacobs. See Jacobs, 115 S.W.3d at 113. 
          We affirm.
 
                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      October 24, 2005
Date Decided          November 16, 2005

Publish




orating evidence is to eliminate from
consideration the accomplice's testimony, and then examine the remaining testimony and evidence
to determine if there is evidence that tends to connect the defendant with the commission of the
offense. Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); Reed, 744 S.W.2d at 125;
Hall v. State, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). The nonaccomplice
testimony does not have to directly link the accused to the crime, it alone need not establish guilt
beyond a reasonable doubt, nor must the corroborating evidence prove all the elements of the alleged
offense. Gill, 873 S.W.2d at 48; Munoz, 853 S.W.2d at 559; Reed, 744 S.W.2d at 126; Jeffery, 169
S.W.3d at 448. The accused's presence at the scene of the crime is, by itself, insufficient to
corroborate an accomplice's testimony. However, "evidence that an accused was in the company of
the accomplice close to the time of the offense, coupled with other suspicious circumstances, may
tend to connect the accused to the offense." Gill, 873 S.W.2d at 49; see also Reed, 744 S.W.2d at
127; Jeffery, 169 S.W.3d at 447; Brown, 159 S.W.3d at 708. Moreover, while evidence that
addresses only motive or opportunity to commit the crime is, by itself, insufficient to corroborate the
accomplice-witness testimony, motive or opportunity evidence may be considered in conjunction
with other evidence tending to connect the accused to the crime. Reed, 744 S.W.2d at 127. 
"Cumulative evidence of 'suspicious circumstances' may be sufficient even if none of the
circumstances would be sufficient individually." Jeffery, 169 S.W.3d at 447; see also Brown, 159
S.W.3d at 708. In the end, every case "must be considered on its own facts and circumstances—on
its own merit." Munoz, 853 S.W.2d at 559; see also Reed, 744 S.W.2d at 126.
            1.         The Nonaccomplice-Witness Evidence
            Viewed in the light most favorable to the jury's verdict, the nonaccomplice-witness evidence
in the case now on appeal established: 
(a)Edi Cruz Garcia died as a result of being shot multiple times with a .380 semi-automatic pistol;
 
(b)medical examiners ruled Garcia's death a homicide;
 
(c)police recovered a Davis Industries .380 semi-automatic pistol near the location
described by Hatley's codefendant Willis during Willis' custodial interrogation;
 
(d)ballistics testing indicated the Davis Industries .380 semi-automatic weapon
recovered by police and admitted into evidence at trial was the same weapon used to kill
Garcia;
 
(e)Hatley told Tamara McMurray that he had witnessed someone being shot on the
afternoon in question, an inculpatory statement that places Hatley at the crime scene;
 
(f)Hatley's counsel admitted during trial that Hatley had participated in the robbery of
Garcia and the other victims;
 
(g)following his flight from the crime scene, Hatley called McMurray and asked her to
drive him to his aunt's house where Hatley then changed clothes;
 
(h)while Hatley was with McMurray, he told her that he had not shot anyone, but that
Willis had shot someone, which further suggests Hatley was at the crime scene;
 
(i)one of the eyewitnesses said two of the robbers wore white T-shirts while the third
wore a red or orange shirt;
 
(j)Hatley had been wearing a red shirt before he changed clothes;
 
(k)Hatley had a red shirt in his possession after he changed clothes at his aunt's house;
 
(l)Hatley was found a few hours following the murder in a vehicle from which police
recovered a red shirt and a black "dew rag" underneath the front passenger seat of the car;
 
(m)Hatley, through counsel, admitted having fled the scene of the crime once shots were
fired;
 
(n)a police tracking dog tracked Hatley's scent from the immediate crime scene to a
point by some nearby railroad tracks;
 
(o)Hatley told his mother that he thought his codefendant was not supposed to take out
the gun during the robbery, a statement which suggests Hatley had foreknowledge of the
robbery plan and that the accomplice had a gun;
 
(p)Ishmael Perez, another of the robbery victims, testified that all three robbers actively
participated in the robbery: one person held the gun, one person fished through the victims'
pockets, and the third person stood guard as a lookout; and
 
(q)the jury watched a videotape of Hatley's custodial interview. During this interview,
Hatley admits going to Lewis' apartment in the early afternoon of July 18, 2003. There,
Hatley, Lewis, and Willis played video games. They then left to go to Hatley's apartment. 
En route to Hatley's apartment, Lewis and Willis told Hatley about a group of Hispanics that
Lewis and Willis had seen "around the corner." Hatley then admitted the three planned to
go "ask" these Hispanics for some money, but if the Hispanics did not give Hatley, Lewis,
and Willis any money, the three would "snatch it and run." Finally, as part of this videotaped
interview, Hatley admits to having conspired with Lewis and Willis to commit the robbery
of the three Hispanic men.
 
            2.         The Accomplice-Witness Evidence
            Lewis testified that he, Willis, and Hatley all lived at the Ponderosa Apartments. Lewis
admitted that, as a result of his involvement in the July 18, 2003, robbery and murder of Garcia,
Lewis had been adjudicated a juvenile delinquent and ordered to serve a twenty-year determinate
sentence. Lewis told the jury that, on the afternoon of July 18, 2003, he and Willis had been playing
video games at Lewis' apartment. Hatley arrived that afternoon and was wearing a red T-shirt, a
black "dew rag," and some gray basketball shorts. Hatley took Lewis and Willis into another
bedroom and asked them to look out the window at a group of Hispanics in the commons area below
the window. According to Lewis, Hatley then asked Lewis and Willis if they wanted to go down and
"get" the Hispanics. Lewis' remaining direct testimony establishes that the three then went to
Hatley's apartment, where Hatley masterminded the robbery, provided the gun to be used in the
commission of the robbery, and told Lewis and Willis that they would call McMurray to pick them
up after the robbery was completed. According to Lewis, all three then walked down the stairs
together and out toward the Hispanic men in the commons area. All three then participated in the
robbery in which Willis wielded the gun. Once the first shot was fired, Lewis testified he and Hatley
ran toward the woods, leaving Willis behind at the scene briefly before Willis fired the next shot and
then ran. Once the three were away from the immediate crime scene, Willis gave the gun to Hatley,
who (according to Lewis) then hid the gun near the railroad tracks. The three then separated. 
            3.         Analysis and Conclusion
            Hatley contends his flight at the time of the crime was reasonable because "[m]ost reasonable
and innocent people would seek to escape the scene of a shooting if possible." This argument has
logical impact, but the contrary argument—that "[T]he wicked flee when no man pursueth; but the
righteous are bold as a lion," Proverbs 28:1—has equal validity. Hatley also notes that his presence
in the commons area of the apartment complex was not, by itself, suspicious because the commons
area was a public space. We cannot disagree. Hatley then asserts that none of his statements to his
mother indicate an intent to help Lewis and Willis rob or murder Garcia. We, however, do disagree
with this assertion. Hatley's statement to his mother that Willis was not supposed to take out the gun
during the robbery amounts to a two-fold admission: First, Hatley knew before the robbery that
Willis had the gun. Second, the fact that Hatley had such foreknowledge suggests Hatley
participated in planning the robbery. Accordingly, we believe that Hatley's statement to his mother
does serve to corroborate Hatley's involvement in the robbery. And, finally, Hatley's admission in
the custodial interview to planning and executing the robbery serves to corroborate the
accomplice-witness testimony.
            Given all the facts and circumstances in this case, both the direct and circumstantial evidence,
we conclude that the nonaccomplice-witness testimony was sufficient to connect Hatley to the
commission of the robbery. Therefore, we overrule Hatley's first point of error.
II.       Factual Sufficiency of the Evidence
            In his second point of error, Hatley contends the evidence is factually insufficient to support
the jury's verdict. The factual sufficiency standard for guilt requires the reviewing court to ask
whether a neutral review of all the evidence demonstrates that the proof of guilt is so obviously weak
as to undermine confidence in the jury's determination, or whether the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof. Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000). 
            Hatley argues that Lewis' testimony is not credible because Lewis received a lesser sentence
in exchange for his testimony. Hatley also points out inconsistencies between Lewis' statement to
police and Lewis' trial testimony. 
            At trial, Lewis admitted he had lied several times in his statement to Ranger Jeffrey Collins
because the sixteen year old was scared and because he thought that, if he lied (to minimize his
involvement), he would get to go home that night. It is well understood that a witness' credibility
is greatly undermined when it is revealed he or she has given contradictory or inconsistent statements
regarding facts at issue. See, e.g., Tex. R. Evid. 613(a); Staley v. State, 888 S.W.2d 45, 49–50 (Tex.
App.—Tyler 1994, no pet.); Black's Law Dictionary 768 (8th ed. 2004) (defining impeach). 
Nonetheless, it is not the province of this Court when conducting a factual sufficiency review to
substitute its assessment of witness credibility for the jury's assessment. See, e.g., Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Paita v. State, 125 S.W.3d 708, 716–17 (Tex.
App.—Houston [1st Dist.] 2003, pet. ref'd); Crutcher v. State, 969 S.W.2d 543, 545 (Tex.
App.—Texarkana 1998, pet. ref'd). Instead, we are to consider all the evidence and weigh the
evidence supporting the jury's verdict against the contrary evidence. Here, the combined weight of
the evidence (which we outlined above) overwhelmingly supports Hatley's conviction, especially in
light of (1) his confession to planning and participating in the underlying robbery, and (2) our law
of parties, see Tex. Pen. Code Ann. § 7.02(b) (Vernon 2003), which makes Hatley guilty of Garcia's
murder due to Hatley's involvement as one of the conspirators participating in the underlying
aggravated robbery. Cf. Crutcher v. State, 969 S.W.2d at 545–46 (evidence sufficient to support
deadly weapon finding even though appellant did not personally use flashlight to beat victim, he was
criminally responsible for coconspirator's use of weapon). We overrule Hatley's second point of
error.
III.      Setting Aside the Negotiated Plea Agreement
            In his third point of error, Hatley contends the trial court erred in setting aside the negotiated
plea agreement of April 13, 2004. Hatley asserts that the negotiated plea agreement's use of the
phrase "fully cooperate" was understood by the parties to mean only that he would testify truthfully
against his codefendants. Because Hatley's refusal to submit to a polygraph examination was
conduct outside of his obligation to testify against his codefendants at their trial(s), the polygraph
refusal should, according to Hatley's appellate argument, not be considered a breach of his negotiated
plea agreement. The State counters that the need for Hatley to submit to the polygraph examination
was part and parcel of his continuing obligation to testify truthfully pursuant to the negotiated plea
agreement. The State argues it needed for Hatley to testify truthfully, and the polygraph was the
State's insurance that Hatley's testimony would, in fact, be truthful. Therefore, when Hatley refused
to cooperate with the polygraph, he breached the negotiated plea agreement. 
            Once a negotiated plea agreement is formally accepted by the trial court, a binding
contractual relationship exists between the State and the defendant. Ortiz v. State, 933 S.W.2d 102,
104 (Tex. Crim. App. 1996); Wright v. State, 158 S.W.3d 590, 593–94 (Tex. App.—San Antonio
2005, pet. ref'd). The Texas Court of Criminal Appeals has written that a defendant is entitled to
specific performance of a negotiated plea agreement once that plea agreement has been accepted by
the trial court, unless, of course, specific performance is impractical; in such cases, the defendant
should be permitted to withdraw his or her plea. Perkins v. Third Supreme Judicial Dist. of Tex., at
Austin, 738 S.W.2d 276, 283 (Tex. Crim. App. 1987). Consequently, where the State or a trial court
has refused to comply with a negotiated plea agreement (which has been previously accepted by that
trial court), defendants have been able to successfully seek specific enforcement of the agreement,
where practicable. See, e.g., id. at 277–78 & 285; Wright, 158 S.W.3d at 594–95. Such a maxim
should be of equal benefit to the State. See Ricketts v. Adamson, 483 U.S. 1, 9–12 (1987) (Arizona
entitled to seek prosecution of original charge of capital murder, and seek death penalty, once
defendant breached agreement to truthfully testify against codefendants).
            Because a negotiated plea agreement is a contract between the parties, we generally turn to
the rules applicable to contract construction to resolve disputes about the meaning of a negotiated
plea agreement. See generally Ex parte Adkins, 767 S.W.2d 809, 810 (Tex. Crim. App. 1989).


 
Contract construction is a matter of law. See Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex.
1999). "A court's primary concern is to ascertain and give effect to the parties' intentions as
expressed in the instrument." Diaz, 9 S.W.3d at 803. "Whether a contract is ambiguous is a
question of law for the court to decide by looking at the contract as a whole in light of the
circumstances present when the contract was entered." Hawthorne v. Countrywide Home Loans,
Inc., 150 S.W.3d 574, 577 (Tex. App.—Austin 2004, no pet.) (citing Nat'l Union Fire Ins. Co. v.
CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995)). "Only when a contract is first determined to
be ambiguous may the courts consider the parties' interpretation and consider extraneous evidence
to determine the true meaning of the instrument." Hawthorne, 150 S.W.3d at 577 (citing Nat'l Union
Fire Ins. Co., 907 S.W.2d at 520).
            In this case, the written negotiated plea agreement called for two things: (1) for Hatley to
testify truthfully against his codefendants and (2) for Hatley to fully cooperate with the State. Hatley
now asks this Court to read ambiguity into the phrase "fully cooperate" and, because the phrase is
confusing, to strictly construe that phrase against the State. At the time the agreement was entered
into, the cases for Hatley's codefendants had not yet gone to trial. The State needed Hatley's
cooperation to prosecute those codefendants, and, in exchange, Hatley would assuredly evade a
capital conviction.


 With this context in mind, we turn to the wording of the negotiated plea
agreement. 
            "Cooperate" means "to work or act together." Webster's II New College Dictionary 248
(2d ed. 2001). "Fully" means "[t]o a complete extent." Webster's II New College Dictionary
452 (2d ed. 2001). Accordingly, the terms of the negotiated plea agreement required Hatley to work
together to a complete extent with the State. There is nothing ambiguous about such a requirement. 
It matters not that the parameters of Hatley's required cooperation were not further delineated: the
adverb "fully" sufficiently defined the scope of Hatley's expected cooperation. Because we do not
hold the phrase "fully cooperate" to be ambiguous in light of the circumstances present when the
negotiated plea agreement contract was entered into, we need not look to extrinsic evidence to
determine the meaning of that agreement.
            Based on Hatley's agreement, the State was entitled to have Hatley testify truthfully. It is
common knowledge that polygraph examinations are used to verify the accuracy of a statement of
a witness—even though such examinations are not generally admissible evidence. We find that,
since Hatley had agreed to testify truthfully and cooperate fully, the State could reasonably require
that Hatley undergo a polygraph examination to test the truthfulness of his statement.
            The plain language of the written agreement called for Hatley to fully cooperate with the
State. Hatley testified he had refused to submit to the polygraph examination. Thus, Hatley broke
the agreement. Because it would be impractical for the trial court to force Hatley to submit to the
polygraph examination or otherwise "fully cooperate" with the State, the State's sole remedy in this
case was to have the plea agreement withdrawn, which the trial court did. No error has been shown. 
We overrule Hatley's third point of error.
IV.      Admission of Evidence Regarding Complainant's Children
            In his final issue, Hatley contends the trial court erred by admitting evidence regarding the
age of the complainant's surviving children during the guilt/innocence phase. We review a trial
court's decision to admit or exclude evidence for abuse of discretion. Osbourn v. State, 92 S.W.3d
531, 537 (Tex. Crim. App. 2002). A trial court abuses its discretion if it acts outside the zone of
reasonable disagreement. Burden v. State, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). If the trial
court's ruling is supported by the record and is correct under any theory of law applicable to the case,
we shall uphold that ruling. Brito Carrasco v. State, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).
            Ishmael Perez testified to the following during direct examination:
                        Q.Did you know Mr. Garcia pretty well?
 
A.For a long time, yeah. We lived together for a while.

                        Q.        Did you and Mr. Garcia share an apartment together for a while?
 
                        A.Yes, we did.
 
Q.Were you guys pretty good friends?
 
                        A.Yes.
 
                        Q.Did you know - did Edi have - was Edi married?
 
                        A.Yes.
 
                        Q.Do you know where his wife lives?
 
                        A.She lives in Mexico, Vera Cruz.
 
                        Q.And does Edi have any kids?
 
                        A.Two.
 
                        Q.Boys or girls?
 
[Defense counsel:] I'm going to object. That has no relevance, their
age.
 
THE COURT: Overruled.
 
                        A.Boys.
 
Q.. . . . Are they grown or are they young?
 
                        A.They're young still.
 
                        Q.Okay. Do you know where Edi worked?
This entire testimony comprised approximately half a page in the fourteen-volume reporter's record. 
            To preserve an issue for appellate review regarding the alleged admission of erroneous
evidence, a defendant must timely object to that evidence at trial. Tex. R. App. P. 33.1(a)(1);
Crivello v. State, 4 S.W.3d 792, 801 (Tex. App.—Texarkana 1999, no pet.). The objection at issue
followed testimony regarding the fact that Garcia had surviving children. Only thereafter did the
witness testify Garcia's surviving children were "young" rather than "grown." But the witness never
gave the children's ages. Nevertheless, Hatley failed to object to the testimony that Garcia's children
were "young" once that testimony was given. Thus, either the complained-of evidence (regarding
the specific ages of the children) was never introduced, or Hatley failed to object following the
testimony that the children were "young." Regardless, nothing has been preserved for our review.
V.        Conclusion
            The State's evidence sufficiently corroborated the testimony of Lewis, the accomplice
witness. The evidence is factually sufficient to support Hatley's conviction for capital murder. The
trial court did not err by withdrawing the negotiated plea agreement after Hatley confessed to
breaching that agreement. And the record reveals no reversible error in the admission of testimony
that the complainant's surviving children were "young." 
            Finding no error, we affirm the trial court's judgment.



                                                                        Jack Carter
                                                                        Justice

Date Submitted:          August 10, 2006
Date Decided:             August 25, 2006

Publish